IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO:** 20-200 |
| v. | : | **DATE FILED:** 6/30/2020 |
| **GLENMARK PHARMACEUTICALS INC., USA** | : | **VIOLATION:** 15 U.S.C. § 1 |
| | : | (conspiracy in restraint of trade - 1 count) |
| | : | |

## INFORMATION

### COUNT ONE
### CONSPIRACY TO RESTRAIN TRADE
### (15 U.S.C. § 1)

The United States of America, through its attorneys, charges that:

At all times relevant to this count:

### BACKGROUND

1. A generic drug is a medication created to be the same as an existing approved brand name drug in dosage form, safety, strength, route of administration, quality, and performance characteristics. Most generic drugs are known by the name of their active ingredient.

2. The generic version of a drug is less expensive to purchase than its brand name equivalent. For this reason, state laws often require pharmacists to fill prescriptions for a particular drug with its generic rather than its brand name version. Nearly 90% of all prescriptions in the United States are filled with generic drugs.

3. Companies that sell generic drugs may manufacture those drugs in their own facilities or purchase them from others (collectively referred to as "manufacturers").

Manufacturers usually sell their generic drugs to a number of different types of customers, including wholesalers, distributors, retail drug stores, drug store chains, and group purchasing organizations.

4. Manufacturers of generic drugs are required by federal regulation to identify a price known as the "Wholesale Acquisition Cost," or "WAC," for each drug they sell. The WAC is defined as the manufacturer's list price to wholesalers or direct purchasers for the most recent month for which information is available. It does not represent actual transaction prices and does not include discounts or rebates. Manufacturers generally announce a new WAC by notifying their customers in writing. Such announcements are typically reported promptly in one or more commercial publications that are available to both customers and manufacturers in the pharmaceutical industry.

5. Customers often enter into contracts with manufacturers for the purchase of generic drugs. The scope of these contracts varies from as few as one drug to as many as all the drugs a specific customer may buy from a specific manufacturer. The duration of these contracts also varies and may last for as long as a year or more. Customers typically enter into contracts with multiple manufacturers.

6. Customers often award contracts for particular generic drugs to manufacturers through a competitive bidding process. The bidding process may be limited to a particular drug or it may include multiple drugs. After receiving and evaluating the bids, customers generally award the contract at issue to the manufacturer offering the lowest price for each drug that they may need during the term of the contract. The contract may give the manufacturer the exclusive right to supply that drug or may designate the winning manufacturer as the "preferred" provider or "supplier."

7.  The contracts between customers and manufacturers of generic drugs set out numerous terms and conditions of sale.  These terms include the price per unit that the manufacturer will charge, which is sometimes referred to as the contract price or the invoice price, and any discounts from that price, which include administrative fees, restocking fees, prompt payment discounts, and volume incentive rebates.  The net price per unit, after all discounts are accounted for, is sometimes referred to in the generic drug industry as the "dead net" price.

8.  Some manufacturers group the different types of customers into "classes of trade" and, in general, charge customers in one class of trade a different price from customers in another class of trade.  There is no regulation that requires manufacturers to disclose or report the contract, invoice, or dead net prices they charge any particular customer or group of customers, and there is no public or commercial publication that regularly reports this data.  As a result, neither a customer seeking to determine what another customer is paying for a particular drug, nor a manufacturer seeking to determine what another manufacturer is charging for a particular drug, can obtain that information from public or commercial sources.

## THE DEFENDANT AND ITS CO-CONSPIRATORS

9.  Defendant **GLENMARK PHARMACEUTICALS INC., USA** ("GLENMARK") was a corporation incorporated in Delaware with its principal place of business in Mahwah, New Jersey.  Defendant GLENMARK marketed and sold generic drugs in the United States.

10. Company A had its principal place of business in Montgomery County, Pennsylvania, within the Eastern District of Pennsylvania.  Company A, directly and through

related entities, was engaged in the manufacturing of generic drugs, and the marketing and sale of generic drugs in the United States.

11. Apotex Corp. ("Apotex"), charged elsewhere, was a corporation incorporated in Delaware and had its principal place of business in Florida. Apotex marketed and sold generic drugs in the United States.

12. Defendant GLENMARK, Company A, Apotex, and others were competitors in the marketing and sale of generic drugs, including pravastatin, in the United States. Pravastatin was a generic drug used to lower cholesterol and thus reduce the risk of heart attack and stroke.

13. Cooperating witness 1 ("CW-1") was employed at Company A, first as a pricing executive and later as a sales executive.

14. Cooperating witness 2 ("CW-2") was employed at defendant GLENMARK as an executive involved in the pricing, sale, and marketing of generic drugs.

15. Individual 1 was employed at Company A as an executive involved in the pricing, sale, and marketing of generic drugs.

16. Individual 2 was employed at Apotex as an executive involved in the pricing, sale, and marketing of generic drugs.

17. Various entities and individuals, not made defendants in this count, participated as co-conspirators in the offense charged herein and performed acts and made statements in furtherance thereof.

18. Any reference in this count to any act, deed, or transaction of any corporation means that the corporation engaged in the act, deed, or transaction by or through its officers, directors, employees, agents, or other representatives while they were actively engaged in the management, direction, control, or transaction of its business or affairs.

## DESCRIPTION OF THE OFFENSE

19. Beginning in or around May 2013 and continuing until at least in or around December 2015, in the Eastern District of Pennsylvania and elsewhere, defendant

## GLENMARK PHARMACEUTICALS INC., USA

and its co-conspirators, including Company A, Apotex, CW-1, CW-2, Individual 1, and Individual 2, knowingly entered into and engaged in a conspiracy to suppress and eliminate competition by agreeing to increase and maintain prices of pravastatin and other generic drugs sold in the United States.  The conspiracy engaged in by the defendant and its co-conspirators was a *per se* unlawful, and thus unreasonable, restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

## MEANS AND METHODS

20. For the purpose of forming and carrying out the charged conspiracy, defendant GLENMARK and its co-conspirators did certain acts, including and among others:

   (a)   communicated about the sale of generic drugs in the United States;

   (b)   agreed during those communications to increase and maintain the prices of generic drugs sold by defendant GLENMARK and Company A in the United States;

   (c)   exchanged during those communications non-public pricing information in order to accomplish the price increases for generic drugs;

   (d)   submitted price increase notifications to customers for generic drugs;

   (e)   refrained from submitting bids and offers for, submitted non-competitive bids and offers for, and declined requests to submit bids and offers for, the sale of generic drugs, to customers that previously purchased from a

5

        competing company;

    (f)    sold generic drugs to customers at collusive and noncompetitive prices;

    (g)    received payments for generic drugs sold at collusive and noncompetitive prices; and

    (h)    participated in communications for the purpose of reaffirming, monitoring, and enforcing adherence to the agreement.

21. For example, on or about May 2, 2013, CW-1 and CW-2 communicated by phone and discussed that Company A would follow a price increase by defendant GLENMARK on several generic drugs that defendant GLENMARK and Company A both sold, including pravastatin.

22. On or about May 15, 2013, defendant GLENMARK distributed price increase notifications to its customers, announcing increases to the prices of certain generic drugs, including pravastatin, effective May 16, 2013.

23. In or around May 2013, CW-1 and Individual 2 communicated by phone and discussed that Company A and Apotex would increase prices on pravastatin.

24. In or around July 2013, Company A increased its prices for certain generic drugs that defendant GLENMARK and Company A both sold. On or about August 9, 2013, Company A increased its prices for pravastatin.

25. Between May 2013 and August 2013, CW-2 and others at defendant GLENMARK communicated with co-conspirators at Company A and other companies about the prices of generic drugs, including pravastatin, for the purpose of ensuring the success of the price increases.

26. On or about December 2, 2013, after a large customer moved its pravastatin

business from Company A to defendant GLENMARK, Individual 1 at Company A contacted CW-2 at defendant GLENMARK by phone to complain that defendant GLENMARK had taken the customer from Company A.

27. Defendant GLENMARK, Company A, and Apotex continued to receive and accept payments for generic drugs affected by the conduct described in this count sold at collusive and noncompetitive prices until at least in or around December 2015.

## TRADE AND COMMERCE

28. During the period covered by this count, defendant GLENMARK and its co-conspirators, including Company A and Apotex, sold substantial quantities of generic drugs affected by the offense charged in this count to customers located in various states in the United States.  In addition, payments from affected customers that purchased drugs sold by defendant GLENMARK and its co-conspirators, including Company A and Apotex, traveled in interstate trade and commerce.

29. During the period covered by this count, the activities of defendant GLENMARK and its co-conspirators, including Company A and Apotex, with respect to the sale of affected generic drugs were within the flow of, and substantially affected, interstate trade and commerce.

All In Violation Of Title 15, United States Code, Section 1.

## GAIN AND LOSS

30. With respect to the offense charged in Count One of this Information, for purposes of determining the alternative maximum fine pursuant to Title 18, United States Code, Section 3571(d), defendant GLENMARK and its co-conspirators derived gross gains of at least $200,000,000, and persons other than the defendant and its co-conspirators suffered gross losses of at least $200,000,000.

DATED: 6/30/2020

_____
MAKAN DELRAHIM
Assistant Attorney General

_____
RICHARD A. POWERS
Deputy Assistant Attorney General
for Criminal Enforcement

_____
MARVIN N. PRICE, JR.
Director of Criminal Enforcement

_____
JAMES J. FREDRICKS
Chief, Washington Criminal II

_____
WILLIAM M. MCSWAIN
United States Attorney for the
Eastern District of Pennsylvania

_____
MARK C. GRUNDVIG
EMMA M. BURNHAM
MATTHEW W. LUNDER
TARA SHINNICK
JAMES A. RYAN
JULIA M. MALONEY
Attorneys
Antitrust Division
United States Department of Justice
450 Fifth Street Northwest, 11th Floor
Washington, D.C. 20530
(202) 305-1878